ALLEN D. THARP AND MARGIE N. THARP, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tharp v. Commissioner
Docket No. 27587-86
United States Tax Court
T.C. Memo 1989-406; 1989 Tax Ct. Memo LEXIS 404; 57 T.C.M. (CCH) 1190; T.C.M. (RIA) 89406; August 7, 1989
James T. Knight and James P. Knight, Jr., for the petitioners. *408 Helen C. T. Smith, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies and additions to tax in petitioners' income tax for the years and in the amounts as follows: Addition to tax,
Tax Year Ended
Deficiency
Sec. 6653(b) [1]
December 31, 1977
$   7,789.95
$   3,894.98
December 31, 1978
668.44
334.22
December 31, 1979
155,255.64
77,627.82
December 31, 1980
171,120.49
85,560.25
December 31, 1981
74,219.11
37,109.56
Totals
$ 409,053.63
$ 204,526.83
Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision: (1) whether petitioners had unreported net income from the sale of catfish during the years 1979, 1980, and 1981; (2) whether an equal partnership for the sale of catfish existed between petitioner and another individual in the year 1981; (3) whether petitioners are entitled to deduct, as soil and *409 water conservation expenditures under section 175, amounts paid in 1981 to construct catfish ponds; (4) whether petitioner Allen D. Tharp is liable for additions to tax under section 6653(b) for each of the years 1977, 1978, 1979, 1980, and 1981; (5) whether the assessment and collection of deficiencies for petitioners' 1977, 1978, 1979, 1980, and 1981 tax years is barred by the statute of limitations; and (6) whether petitioner Margie N. Tharp should be relieved from the deficiencies for each of the years in issue under section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Isola, Mississippi at the time of the filing of their petition in this case, filed joint Federal income tax returns on a cash basis for each of the calendar years 1977 through 1981 with the Internal Revenue Service Center in Atlanta, Georgia. Isola, Mississippi is located in Humphreys County in the Delta area of Mississippi. Over the past 20 to 25 years, Humphreys County has become a leader in the catfish farming industry. There were approximately 140 catfish farmers in Humphreys County during the years here in *410 issue. Catfish are grown in earthen ponds which are surrounded by six-foot levees. The ponds are fed by wells. Approximately 42,000 acres of land in Humphreys County are devoted to catfish ponds. Out of each "land-acre," devoted to a catfish pond, approximately 18 percent is taken up by the levees. The remaining 82 percent constitutes the ponds. The production of catfish begins in a separate pond where the catfish are hatched from eggs. The newly hatched catfish still have the egg sac and yolk attached and are called "sac fry." Over the next three to five days, the sac fry absorb the egg yolk for food. When the yolk and sac are completely absorbed, the fish are referred to as "swim-up fry." The farmer begins to feed the swim-up fry while they are still in the hatchery. The fish are fed various types of grain such as soybeans, corn, and wheat. Although swim-up fry do not require much feed, they must be fed frequently or they will die from starvation. After approximately 10 days of feeding in the hatchery, the fish are about one-quarter of an inch long and are referred to as "fingerlings." At this point, the farmer removes the fingerlings from the hatchery and places them *411 in a regular pond where they are fed and grown until they are ready to be sold. The fish continue to be referred to as fingerlings until they weigh approximately one-quarter of a pound. After their weight exceeds one quarter of a pound, the fish are referred to as "stockers." In approximately eighteen to twenty-four months, when the fish weigh anywhere from three quarters of a pound to one and three-quarters of a pound each (one and one-quarter of a pound is the optimum weight), they are ready to be sold as food and are referred to as "food-fish." The food-fish are harvested by spreading a large net, known as a seine, across a pond. The net is dragged by tractors from one end of the pond to the other. The fish caught by the net are lifted and loaded onto trucks. The farmer generally sells the food-fish either directly to a fish processing plant or to a "live-hauler." A processing plant prepares the food-fish for resale. Some processors clean and dress the food-fish while others merely gut the food-fish. A live-hauler is a person who purchases catfish from the farmer and transports them in a truck equipped with tanks of water to a processing plant or fish market where he can *412 generally resell the catfish at a profit. The recommended size of each pond, excluding levees, is approximately 17 acres (20 acres including levees). The shape of the pond depends largely on the shape of the land on which it is constructed. The pond is constructed by first excavating a shallow six to twelve inch depression in the land. Earthen levees approximately six feet in height are then built up around the depression to form the pond. After construction of the pond is complete, a well is drilled, pipes are laid, and the pond is filled with water. The water level in the pond is maintained at approximately four feet. Once fingerlings are placed in a pond, good management techniques require that the farmer keep accurate records as to the amount of feed he places in the pond. Good management techniques also require that the farmer keep close track of the amount of oxygen in the pond water. If the oxygen level becomes too low, the fish will suffocate from lack of oxygen. In order to maintain an adequate level of oxygen, the water must be aerated, especially during the summer months, with mechanical devices such as paddle wheels. These devices are powered either by electric *413 motors or by a tractor which pulls the aeration device. The farmer must also monitor the level of chemicals in his ponds, as well as monitor his fish for signs of disease and parasites. If a catfish farmer utilizes good management techniques, he should be able to obtain one pound of fingerlings for every one and four-tenths of a pound of catfish feed. Thus, the feed conversion ratio for fingerlings is approximately 1.4 to 1. Under good management techniques, a catfish farmer should be able to obtain one pound of marketable food-fish for every one and eighth-tenths of a pound of catfish feed. Thus, the feed conversion ratio for food-fish, under good management techniques, is approximately 1.8 pounds of feed to one pound of fish. However, farmers generally utilize a feed conversion ratio of 2 to 1 for record-keeping purposes. During the years at issue here, if a Humphreys County catfish farmer employed good management techniques, he could expect to obtain anywhere from 3,700 to 4,100 pounds of food-fish per "water-acre." Some catfish farmers obtained as much as 7,000 pounds of food-fish per water-acre. A farmer who used poor management techniques could produce as little as 3,500 *414 pounds per water acre. Petitioner Allen D. Tharp (petitioner or Mr. Tharp) began cultivating catfish in Humphreys County in 1965, and continued in that business throughout the years here in issue. From January 1975 until May 1983, petitioner employed Mr. Dwayne Glasner on his catfish farm. Mr. Glasner oversaw various aspects of the operation including feeding the catfish, maintaining oxygen levels, raising fingerlings, harvesting the catfish, and loading the fish for transport to market. Petitioner also had several other full or part-time employees. During the period 1979 through 1981, Mr. Tharp owned or rented approximately 280 water-acres which were devoted to the cultivation of catfish. Out of this amount, approximately 30 water-acres typically went unused, in any given year, because of construction or reworking of the ponds, or lack of catfish feed. Some ponds were devoted entirely to the production of fingerlings, rather than food-fish. Petitioner sold some of these fingerlings to other catfish farmers as stock for their ponds. During 1979, 1980, and 1981, petitioner purchased all of the feed for his catfish from Producers Feed Company of Belzoni, Mississippi. In 1979, *415 petitioner purchased 402.56 tons of feed. In 1980, he purchased 318.225 tons of feed. In 1981, petitioner purchased 199.98 tons of catfish feed. After petitioner raised his catfish to a marketable size, he would sell the food-fish to a fish processor or to a live-hauler. During the years 1979, 1980 and 1981, petitioner sold large quantities of food-fish to Mr. Lee S. King of King's Fish Market in Jonesville, Louisiana. Jonesville, Louisiana is located approximately 130 to 140 miles from the Tharp's farm in Isola, Mississippi. During 1979, 1980, and the first five and one-half months of 1981, Mr. Tharp transported the food-fish from his ponds to market himself in a one-ton Chevrolet truck. The fish were placed on ice for the journey and, although alive when removed from the ponds, often had expired by the time they reached King's Fish Market. Once at the market, Mr. King would inspect the catfish and pay for those he wanted. He would issue invoice-type tickets reflecting the amount paid, the amount of fish (in pounds) purchased, and the person from whom the fish were purchased. Mr. King would, thereafter, process the fish for resale. During the years 1979 through 1981, Mr. *416 King purchased ever-increasing amounts of catfish from petitioner. As was Mr. King's practice during the years at issue, the transactions were always conducted in cash, even though the amount of money changing hands was, at times, substantial. In 1979, petitioner made at least 80 separate sales of catfish to Mr. King. The price per pound of catfish paid by Mr. King in 1979 ranged from 20 cents per pound to 74 cents per pound. Mr. King paid petitioner an average price per pound for catfish in 1979 of 71 cents. The largest single sale during 1979 took place in March. On March 2, 1979, petitioner sold Mr. King 12,590 pounds of catfish for $ 8,057.60. During all of 1979, Mr. King purchased a total of 484,330 pounds of catfish from petitioner for a total purchase price of $ 327,885.66. In 1980, petitioner made at least 85 separate sales of catfish to Mr. King. The price per pound of catfish paid by Mr. King ranged from 50 cents per pound to 79 cents per pound. Mr. King paid petitioner an average price per pound in 1980 of 78 cents. The largest single sale during 1980 took place in March. On March 11, 1980, petitioner sold Mr. King 15,060 pounds of food-fish for $ 11,897.40. During *417 all of 1980, Mr. King purchased a total of 581,351 pounds of food-fish from petitioner for a total purchase price of $ 453,222.92. In 1981, petitioner made at least 101 separate sales of catfish to Mr. King. Mr. King paid petitioner 74 cents per pound for catfish in three sales in 1981 and 79 cents per pound for the balance of the sales. We have therefore considered the average price per pound paid by Mr. King to petitioner for catfish in 1981 to be 79 cents per pound. The largest single sale during 1981 took place in January. On January 26, 1981, petitioner sold Mr. King 34,058 pounds of catfish for $ 26,905.75. During all of 1981, Mr. King purchased a total of 1,196,568 pounds of food-fish from petitioner for a total purchase price of $ 943,760.12. During 1979, petitioner also made sales of catfish in the total amount of $ 25,000 to Mr. Grady Crawford, doing business as Triangle Fish Company. In 1979, he sold catfish in the total amount of $ 4,659.64 to Mr. Ed Gilliam, doing business as Ed's Live Catfish of Baton Rouge, Louisiana. Also during 1979, petitioner sold fish to Mr. Charlie Kines, doing business as Louisville Wholesale Bait of Louisville, Kentucky for a total *418 amount of $ 43,805.70. During 1980 and 1981, petitioner also sold food-fish from his ponds to an independent live-hauler named Mr. Bill Boutwell. In 1980, Mr. Boutwell purchased catfish from petitioner for a total amount of $ 34,435.26. In 1981, Mr. Boutwell purchased catfish from petitioner for a total amount of $ 48,428.62. Mr. Tharp also arranged catfish sales between Mr. Boutwell and neighboring catfish farmers. During all of the years at issue, Mr. Tharp arranged sales between local catfish farmers and other out-of-state live-haulers. Because he could not keep up with the demand created by Mr. King's purchases, Mr. Tharp began buying food-fish from other Humphreys County farmers in 1979. During 1979, petitioner purchased at least 13,162 pounds of food-fish from local catfish farms for a total purchase price of $ 7,480.00. During 1980, petitioner purchased at least 232,540 pounds of food-fish from local catfish farms for a total purchase price of $ 143,737.00. During 1981, petitioner purchased at least 928,151 pounds of food-fish from local catfish farms for a total purchase price of $ 625,658.40. Sometime in 1981, because of spoilage problems, Mr. King refused to purchase *419 any more fish from petitioner unless they were kept alive during transport. On June 17, 1981, Mr. Tharp entered into an oral agreement with Mr. Jim Ashworth under which the men would "live-haul" catfish to King's Fish Market in Louisiana. They purchased a tractor-trailer rig for approximately $ 20,000 with money borrowed from the Guaranty Bank and Trust in Belzoni, Mississippi. Both Mr. Tharp's name and Mr. Ashworth's name appear on the bank note. The trailer was fitted with tanks capable of holding water and catfish. Mr. Tharp paid for the construction of the tanks; however, the tanks were installed and maintained by Mr. Tharp and Mr. Ashworth. Repairs on the tractor-trailer itself (i.e., air leaks, wheel bearings, seals, etc.) were often performed by Mr. James Donald, a man who ran a diesel repair business in Greenville, Mississippi. On at least one occasion in 1981, Mr. Tharp specifically requested that, because he was paying for the repairs in cash, the Mississippi sales tax due on the transaction be excluded from the total amount he owed. Mr. Donald was forced to make up another invoice reflecting the amended amount. Thereafter, Mr. Tharp assumed that he could avoid *420 paying sales tax if he paid Mr. Donald in cash. Mr. Ashworth did not haul catfish grown on petitioner's catfish farm (except on one or two occasions) and Mr. Ashworth did not participate in petitioner's farming operations. Mr. Tharp and Mr. Ashworth would travel to a catfish farm in the Humphreys County area to buy food-fish. The farmer would seine, weigh, and load the desired amount of fish into the tanks which had been installed on the tractor-trailer. Mr. Tharp would then pay the farmer for his fish. Mr. Tharp always paid for the fish in cash, even though most customers paid the farmers for their catfish purchases by check. Mr. Ashworth was generally not present when this money changed hands. Mr. Ashworth would haul the live catfish to King's Fish Market in Jonesville. Mr. Tharp sometimes accompanied Mr. Ashworth to Jonesville. After Mr. Ashworth arrived at the market, Mr. King, the proprietor of the market, would inspect the catfish. He would then pay for those fish that met with his approval. As before, the transactions with Mr. King were conducted in cash. After the sale was complete, Mr. Ashworth would transport the remaining unselected fish back to Isola and give *421 the cash he had received to Mr. Tharp or Mrs. Tharp. Sales to Mr. King tapered off at times because of certain disagreements which arose between Mr. Tharp and Mr. King. Mr. Tharp and Mr. Ashworth discussed splitting the net profits "from the hauling" equally. However, Mr. Ashworth did not participate in the purchase and sale of catfish, but rather took instructions from Mr. Tharp as to where and when to pick up fish paid for by Mr. Tharp and where to deliver the fish. He would then bring the cash paid for the fish to Mr. or Mrs. Tharp. The tractor-trailer was titled solely in Mr. Ashworth's name. Mr. Ashworth also appears as the owner and policyholder on a contract of insurance purchased with respect to the rig. The name, "Jim's Catfish Hauling," was painted on the side of the trailer. Mr. Tharp maintained sole control of the finances of the operation. Proceeds from the sale of the catfish were put in a safe which petitioners maintained in their home. Payments on the tractor-trailer bank note were made by Mr. Tharp as were other expenses of the operation such as insurance and repairs. After expenses were paid, Mr. Tharp would pay Mr. Ashworth the amount which Mr. Tharp *422 determined to be due to Mr. Ashworth. Mr. Ashworth received $ 4,000 from Mr. Tharp in 1981. Subsequently, Mr. Tharp and Mr. Ashworth acquired a second trailer. The second trailer was larger than the first and could carry more water and catfish. Mr. Tharp supplied the funds to acquire the trailer. The second trailer was also titled in Mr. Ashworth's name and Mr. Ashworth was listed as the owner on the insurance policy. During 1982, Mr. Ashworth received an additional $ 1,800 from Mr. Tharp in connection with the live-hauling operation. However, in April 1982, after their relationship became strained, Mr. Ashworth stopped hauling fish for Mr. Tharp. In settlement of their accounts, Mr. Ashworth transferred title to the tractor and the second trailer to Mr. Tharp. Mr. Tharp assumed sole liability on the bank note. Mr. Ashworth retained title to the first trailer which, at the time of the transfer, was worth approximately $ 1,000. Mr. Tharp also transferred to Mr. Ashworth the title to a used car which was worth approximately $ 3,000. Mr. Ashworth subsequently acquired another tractor to pull the trailer he retained and continued the live-hauling business on his own. In *423 1981, petitioner decided to construct several new catfish ponds which would be devoted entirely to fingerling production. The ponds were to be constructed on 113 acres of land located near petitioners' house which were owned by Mr. Tharp's father. Prior to construction of the ponds, Mr. Tharp's father had rented out the land for the cultivation of row crops (rice, cotton, soybeans, etc.). The 113 acres had been subject to some soil erosion but no more than would be usual for any plot of land. Mr. Tharp's father had previously cut and graded the land which helped stop the erosion. Petitioner paid Mr. Sidney Earl Williams of Leland, Mississippi $ 124,874 to build the new catfish ponds. Petitioner borrowed the money for construction of the ponds from the Indianola Production Credit Association (the PCA). Petitioner also paid Mr. Williams an additional $ 21,905 to rebuild two existing catfish ponds. Construction of the ponds proceeded fairly quickly. However, no salable catfish were produced from the new ponds until 1982. The catfish ponds have an expected useful life of approximately 30 years. During the taxable years 1977 through 1981, petitioner also earned income cultivating *424 and selling rice. Mr. Tharp owned approximately 320 acres of land which were devoted to rice cultivation. In addition, petitioner earned income transporting various farm products. Mr. Tharp transported cotton, on behalf of Mid-Delta Cotton Processors, from the gin to a warehouse. In 1981, petitioner received $ 34,284 in hauling income. Mr. Tharp and Mrs. Tharp were married in 1975. During the taxable years at issue, Mrs. Tharp did not work outside the home. Instead, she devoted full time to caring for petitioners' three children and maintaining their household. During the years at issue and at the time of trial, petitioners' home was located just off Highway 49 in Humphreys County, Mississippi. The home is one-story and is approximately 2,100 square feet in size. The title to petitioners' home is in Mr. Tharp's name and the farmland is in his name. During the years at issue, Mrs. Tharp drove a 1978 Chevrolet van and Mr. Tharp drove an older-model pickup truck. Petitioners also owned a 1979 Oldsmobile which they let their daughter drive. During the years at issue, petitioners purchased a two-seater Piper aircraft for under $ 5,000. Mr. Tharp also purchased a mink and *425 leather coat for Mrs. Tharp for approximately $ 1,000. The Tharps took two vacations during the years at issue. Mr. and Mrs. Tharp spent four days in Las Vegas. The entire family traveled to Florida one year with the Tharps' neighbors. Additionally, Mrs. Tharp traveled to Hawaii with her daughter in 1982. Mr. Tharp did not accompany them to Hawaii. As of December 31, 1978, petitioners owed approximately $ 140,059 to the PCA. By the end of 1979, the amount of this debt had been reduced by $ 103,109 to $ 36,950. However, as of December 31, 1980, petitioners' indebtedness to the PCA had increased by $ 131,098 to $ 168,048. By December 31, 1981, petitioners' indebtedness had again increased, this time by $ 267,355.50 to $ 435,403.50. This increase includes the amounts petitioner borrowed to pay for the construction of new catfish ponds in 1981. Petitioners were required to purchase PCA stock in proportion to their indebtedness. As of December 31, 1978, petitioners owned approximately $ 13,605 worth of PCA stock. The amount of stock petitioners owned did not decrease when their debt decreased in 1979. As of December 31, 1980, petitioners owned $ 19,495 worth of PCA stock *426 and, as of December 31, 1981, petitioners owned $ 35,635 worth of PCA stock. During the years at issue, petitioners maintained a joint bank account at the Guaranty Bank and Trust Company of Belzoni, Mississippi (Guaranty). Petitioners paid both personal and farm expenses from this account. They did not maintain any other bank account. Each month, Mrs. Tharp and Mr. Tharp would review the personal and farm bills which they had received during the month to insure that the amount billed was correct. Mrs. Tharp would then issue checks on the account in payment of the amounts billed. She would ask Mr. Tharp to deposit money in the account to cover the checks she had written. However, Mrs. Tharp was not involved in the preparation of the farm payroll. Mr. Tharp prepared the payroll and issued checks to farm employees. Mr. Tharp also paid some farm expenses, such as repair bills, with cash. During the taxable years 1977 through 1981, the accounting firm of C. L. Puckett, Tax Consultants of Belzoni, Mississippi (the Puckett firm) maintained petitioners' books of account. The only form of accounting record maintained on behalf of petitioners by the Puckett firm was a cash journal. *427 Mr. Tharp would turn over his records from Guaranty bank to the Puckett firm each month for the firm to use in preparing the cash journal. Mrs. Tharp was aware that Mr. Tharp turned over the bank statements on a monthly basis for this purpose. Petitioners themselves did not maintain any independent set of records. The Puckett firm was a family firm consisting of Mr. C. L. Puckett (Mr. Puckett), his wife, his daughter Ms. Laura Ann Puckett Byars (Ms. Byars), and his son. Mr. Puckett died on September 5, 1982. Ms. Byars was primarily responsible for preparing petitioners' cash journal. Her work was reviewed by Mr. Puckett. She prepared the cash journal solely from the bank statements, deposit slips, and cancelled checks which petitioners submitted on a monthly basis. Because petitioners did not maintain individual accounts for personal and farm business and thus received only one combined monthly statement from Guaranty, it was necessary for Ms. Byars to identify and separate out petitioners' personal deposits and expenses from those deposits and expenses which related to their farm business. Ms. Byars also classified the deposits according to the type of income (i.e., farm *428 income, receipts from the sale of farm equipment, etc.) involved. The Puckett firm also prepared petitioners' Federal income tax returns for the taxable years 1977 through 1981. At the end of the year, Ms. Byars reviewed petitioners' cash journal. If, during the year, Ms. Byars could not definitely identify a particular deposit or expense on petitioners' bank statement from the amount of the item or from the notations which occasionally appeared on the corresponding deposit slip or cancelled check, she would place the item in a suspense account. Then, at the end of the year, when preparing petitioners' tax returns, she would contact Mr. Tharp or Mrs. Tharp and ask that the unexplained item be identified so that it could be properly classified. If they could not identify a particular deposit, Ms. Byars would classify the item as fish income. If they could not identify a particular check, Ms. Byars would classify the item as a personal expense. After all unidentified items had been removed from suspense accounts, Ms. Byars would prepare a Schedule F, "Farm Income and Expenses," and a Form 1040, "U.S. Individual Income Tax Return" for the Tharps. The Puckett firm also prepared *429 Forms W-2 for petitioner's farm employees and petitioners' state income tax returns. After Ms. Byars completed petitioners' Federal income tax return, Mr. Puckett reviewed her work. The Puckett firm would then contact petitioners and inform them that their return was ready. If petitioners had questions, Mr. Puckett would go over their return with them. Petitioners would then sign and file the return. Because of their extensive reliance on petitioners' banking records, the Puckett firm advised Mr. Tharp of the importance of depositing all of petitioners' income in their account at Guaranty. Even though Mr. Tharp understood that the Puckett firm was relying on petitioners' banking records in the preparation of their books and Federal income tax returns, Mr. Tharp failed to deposit large amounts of receipts from the sale of catfish in petitioners' account at Guaranty. In addition, Mr. Tharp failed to inform Ms. Byars of his cash purchases of catfish from local farmers. Ms. Byars was not aware of petitioner's food-fish sales to Mr. King and Mr. Boutwell or petitioner's fish sales to Mr. Crawford, Mr. Gilliam, and Mr. Kines when she prepared petitioners' 1979, 1980, and 1981 Federal *430 income tax returns. Consequently, neither these sales nor petitioner's cash purchases of catfish were reported on petitioners' tax returns. On Schedule F of their 1977 return, petitioners reported $ 202,023.79 in gross receipts from the sale of fish. Petitioners reported a net farm profit of $ 54,388.17 and a total tax liability for 1977 of $ 11,047.77. On Schedule F of their 1978 return, petitioners reported $ 181,450.47 in gross receipts from the sale of fish. Petitioners reported a net farm profit of $ 12,329.22 and a total tax liability for 1978 of $ 1,667.11. On Schedule F of their 1979 Federal income tax return, petitioners reported $ 306,498.60 in gross receipts from the sale of catfish. Petitioners understated their 1979 gross receipts from the sale of fish by $ 192,185.66. Petitioners reported a net farm profit of $ 148,530.40 and a tax liability for 1979 of $ 49,301.17. On Schedule F of their 1980 return, petitioners reported $ 135,209.23 in gross receipts from the sale of catfish. Petitioners understated their 1980 gross receipts from the sale of fish by $ 391,278.18. Petitioners reported a farm loss of $ 33,483.81 and an overall loss of $ 32,918.26 on their 1980 *431 return. Petitioners paid no Federal income tax for their 1980 tax year. On March 5, 1981, petitioners jointly filed a Form 1045, "Application for Tentative Refund," with the Internal Revenue Service Center in Atlanta, Georgia. On this application, petitioners carried back the loss reported on their 1980 Federal income tax return to their 1977 tax year and received a refund in the amount of $ 7,789.95 of the taxes they paid in 1977. On Schedule F of their 1981 return, petitioners reported $ 93,386.96 in gross receipts from the sale of fish. Petitioners understated their 1981 gross receipts from the sale of fish by $ 931,688.74. Petitioners also failed to report $ 16,284 in income received by Mr. Tharp from hauling farm products. Finally, petitioners deducted $ 122,825 of the amount they paid Mr. Williams for the construction of new catfish ponds in 1981 as soil and water conservation expenditures under section 175. Petitioners reported a farm loss of $ 247,188.71 and an overall loss of $ 246,194.26. Petitioners paid no Federal income tax for their 1981 tax year. On July 6, 1982, petitioners filed another Form 1045, "Application for Tentative Refund," with the Internal Revenue *432 Service Center at Atlanta, Georgia. On this application, petitioners carried back the loss reported on their 1981 Federal income tax return to their 1978 and 1979 tax years. They received a refund in the amount of $ 668.44 of the taxes they paid in 1978. In August 1982, the Examination Division of the Internal Revenue Service in Greenville, Mississippi began an investigation of petitioners' 1979, 1980, and 1981 tax years. During this investigation, Revenue Agent Brian Sweet (Agent Sweet) determined that petitioner had sold large quantities of fish to certain businesses and persons located outside the state of Mississippi. Agent Sweet contacted Mr. Boutwell and spent several days at King's Fish Market in Louisiana analyzing the invoice tickets which Mr. King had retained and which reflected purchases from Mr. Tharp. On January 10, 1983, this investigation of petitioners' returns for the years 1979, 1980 and 1981 was transferred to the Criminal Investigation Division (CID) of the Internal Revenue Service for an assessment of the potential for criminal prosecution of Mr. Tharp. In February 1983, Special Agent Samuel James Baker (Special Agent Baker) was assigned to investigate *433 the criminal potential of the audit referral from the Examination Division. In March 1983, Mr. James Knight (Mr. Knight), attorney for petitioners, was informed that a criminal investigation was being conducted. Special Agent Baker had been involved in a national project which examined underreporting of income by catfish farmers and live-haulers. He had previously investigated and recommended criminal prosecution of seven other catfish farmers. Special Agent Baker conducted what is known as a "specific-item determination" of petitioners' income. He began his criminal investigation by following through on the contacts that Agent Sweet had initiated. After his investigation began in detail, Special Agent Baker discovered that Mr. Glasner and Mr. Ashworth, as well as other employees of petitioner, could supply him with the names of persons and businesses with whom Mr. Tharp conducted catfish transactions. During the course of his investigation, Special Agent Baker spoke with Mr. Ashworth and interviewed, under oath, Mr. Glasner. Mr. Glasner supplied Special Agent Baker with names of approximately 40 individual fish farmers in the Humphreys County area with whom Mr. Tharp had done *434 business. Mr. Glasner estimated that petitioner's total purchases of catfish during the three years 1979, 1980 and 1981 ranged from a low of 858,000 pounds to a high of 1,181,000 pounds. He estimated that Mr. Tharp purchased 5 percent of the fish he sold to Mr. King in 1979, 40 percent of the fish he sold to Mr. King in 1980, and 75 percent of the fish he sold to Mr. King in 1981. Mr. Glasner also stated that Mr. Tharp told him that he bought fish from other farmers for cash so no record would be made of these purchases. Special Agent Baker also contacted the United States Department of Agriculture, the Soil Conservation Service, and the Mississippi State Graduate School to determine the names of fish processing plants and fish farmers in Mississippi, Louisiana, and Arkansas. Special Agent Baker contacted each of the fish processing plants and analyzed their records, thereby further expanding his list of local catfish farmers. Eventually, he contacted the vast majority of catfish farmers in the southern United States, including every catfish farmer in Humphreys County. Special Agent Baker also contacted every person whose name was supplied to him by Mr. Knight, petitioners' attorney. *435 After compiling this list of catfish farmers and processors, Special Agent Baker contacted every person on the list to determine whether they had ever done business with Mr. Tharp. If there was any indication that Mr. Tharp may have purchased fish from or sold fish to a particular person, that person was interviewed personally and a sworn statement was taken. The object of Special Agent Baker's inquiries was to determine petitioner's gross receipts from the sale of catfish. In addition, because it was obvious to Special Agent Baker that petitioner could not have grown the amount of catfish he had sold, he made an equal effort to determine the amount of fish, if any, petitioner had purchased from other farmers and then resold. Special Agent Baker contacted every catfish farmer whose name was furnished to him by Mr. Glasner and Mr. Knight and also other catfish farmers in the southeast whose names he had obtained from the Department of Agriculture or other sources. Special Agent Baker interviewed every catfish farmer who told him that he had sold fish to Mr. Tharp. Special Agent Baker also obtained the names of several hundred local and out-of-state live-haulers from the United *436 States Department of Agriculture. Special Agent Baker sent letters to each and every live-hauler inquiring whether he had ever done business with Mr. Tharp. If a live-hauler indicated that he had done business with Mr. Tharp, Special Agent Baker or a revenue agent contacted the live-hauler either by phone or in person to determine the extent and nature of these dealings with Mr. Tharp. In addition, if it appeared that the live-hauler had received the letter but had simply not responded, Special Agent Baker followed up the letter with a phone call. As a result of his efforts, Special Agent Baker was able to establish contact with all but a dozen or fewer live-haulers. After contacting and interviewing the persons and businesses described above, Special Agent Baker determined a tentative figure for petitioner's total gross receipts from the sale of catfish for the taxable years 1979, 1980, and 1981 from the information he had gathered during the course of his investigation. In order to determine the portion of these gross receipts which had been reported on petitioners' returns, he contacted the Puckett firm and obtained petitioners' books of account from Ms. Byars. He also obtained *437 petitioners' bank records for 1979, 1980, and 1981 from Guaranty. Special Agent Baker reduced the total gross receipts figure he had obtained through investigation by the amount of gross receipts which had been reported on petitioners' returns. Petitioners did not report any purchases of catfish on their 1979, 1980, and 1981 returns. Therefore, Special Agent Baker subtracted all of the costs of purchases of catfish which he had determined through investigation from the gross receipts which had not been reported on petitioners' returns. Finally, he obtained petitioners' unreported taxable income by allowing additional business expenses (i.e., depreciation, repairs, etc.) attributable to petitioner's hauling operations. As a result of his investigation, Special Agent Baker recommended that Mr. Tharp be prosecuted under section 7206(1) for willfully making and subscribing Federal income tax returns for the taxable years 1979, 1980, and 1981 which he did not believe to be true and correct as to every material matter. In addition, Special Agent Baker recommended that Mr. Tharp be prosecuted under section 7201 for willfully attempting to evade or defeat Federal income tax. Special *438 Agent Baker concluded his investigation in August 1984. On July 31, 1985, Mr. Tharp entered into a plea agreement with the United States Attorney for the Northern District of Mississippi. Mr. Tharp agreed to plead guilty to one count of violating section 7206(1) by filing a false Federal income tax return for the calendar year 1981. The Government agreed not to prosecute Mr. Tharp for filing false tax returns or tax evasion for the calendar years 1979 and 1980, or for tax evasion for the calendar year 1981. On October 10, 1985, the United States District Court for the Northern District of Mississippi found Mr. Tharp guilty of violating section 7206(1) for the taxable year 1981. Mr. Tharp was fined $ 5,000 and was sentenced to eighteen months in prison. Respondent issued the notice of deficiency in this case on April 11, 1986. In his notice of deficiency, respondent determined deficiencies in petitioners' income taxes for each of the taxable years 1977 through 1981. The deficiencies for 1977 and 1978 are attributable solely to the refunds petitioners received as a result of their net operating loss carrybacks. . Respondent did not adjust petitioners' taxable income for the *439 tax years 1977 and 1978, as reported on their returns for such years. Respondent did make numerous adjustments in petitioners' 1979, 1980, and 1981 taxable incomes, only some of which are at issue in this case. Respondent determined that: (1) petitioners had overstated their rent expense in 1979 and 1980 by $ 17,847.40 and $ 2,400, respectively; (2) petitioners had overstated their utilities expense by $ 2,506.72 in 1979, $ 3,183.31 in 1980, and $ 3,407.62 in 1981; (3) petitioners had overstated their oil and gas expense by $ 600 in 1979, $ 900 in 1980, and $ 1,200 in 1981; (4) petitioners had overstated their insurance expense by $ 1,315 in 1979, $ 1,922 in 1980, and $ 787 in 1981; and (5) petitioners had understated the income they received in 1981 from Mr. Tharp's hauling for Mid-Delta Cotton Processors by $ 16,284. Petitioners have conceded that these adjustments are correct. In addition to the above adjustments, respondent adjusted petitioners' gross receipts and costs of goods sold. He increased petitioners' 1979 gross receipts from fish sales by $ 192,185.66 to $ 498,684.26. He increased petitioners' 1980 gross receipts from fish sales by $ 391,278.18 to $ 526,487.41. *440 Finally, he increased petitioners' 1981 gross receipts from fish sales by $ 931,688.74 to $ 1,025,075.70. Respondent increased petitioners' costs of goods sold for the taxable years 1979, 1980, and 1981 by $ 7,480, $ 61,752, and $ 625,658.40, respectively. These figures represent petitioner's purchases of fish during the years at issue, as determined by respondent. Finally, respondent determined that the amount which petitioner paid for the construction of catfish ponds in 1981 was a capital expenditure rather than a deductible expense. Thus, petitioners were only entitled to deduct $ 5,900 in pond construction expense during 1981 instead of the $ 122,825 they deducted on their 1981 return. However, respondent did determine that the ponds were subject to accelerated depreciation. He adjusted petitioners' depreciation deductions to reflect the inclusion of the ponds in depreciable assets and also made several other adjustments, the net effect of which was to increase petitioners' deductions for depreciation. For purposes of trial, the parties have stipulated to the amount of gross receipts petitioner (or, as petitioners contend, for portions of 1981, the partnership of Mr. *441 Tharp and Mr. Ashworth) earned during 1979, 1980, and 1981 from the sale of fish. The parties have also stipulated to the amount of such gross receipts which were not reported. Finally, the parties have stipulated to the minimum amount of costs of goods sold to which petitioners are entitled. These stipulated amounts correspond to the amounts determined by respondent in his notice of deficiency, except for a minor discrepancy in 1981. OPINION Petitioners contend that respondent's determinations of deficiencies are arbitrary and excessive and therefore the burden of going forward with the evidence should be shifted to respondent. See Kluger v. Commissioner, 83 T.C. 309, 310 n.1 (1984). Respondent's determinations are presumptively correct and the taxpayers have the burden of proving that respondent's determinations are incorrect. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). However, if a taxpayer can show that respondent's determinations are arbitrary or excessive, the determinations lose their presumption of correctness and, since the taxpayer is not required to prove the correct amount of tax owing, the burden of going forward *442 with evidence to show the amount of tax owed, if any, is on respondent. Helvering v. Taylor, 293 U.S. 507 (1935). At trial, petitioners introduced into evidence a net worth computation of their income prepared by a certified public accountant, Mr. Keith Powers. Petitioners claim that this net worth computation conclusively shows that they could not possibly have earned the amounts of income which respondent determined under the specific-item method of income reconstruction. These computations yield results which closely parallel the income and loss reported by petitioners on their 1979, 1980, and 1981 returns. Petitioners urge us to disregard respondent's determinations as arbitrary and excessive and to shift the burden of going forward with the evidence to respondent. In our view, petitioners' position is without merit. In Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court, the taxpayer operated several retail liquor outlets. The taxpayer transacted a substantial amount of business in cash and commingled business and personal expenses. Although the taxpayer maintained a cash receipts journal, the *443 journal was incomplete. Furthermore, the taxpayer failed to deposit all of his receipts in his bank accounts. Because respondent found the taxpayer's books and records to be totally inadequate, he was forced to reconstruct the taxpayer's income using a percentage markup method. Respondent was able to definitely determine the taxpayer's costs of goods sold by examining the records of all of the wholesalers who sold liquor to the taxpayer. Respondent determined the taxpayer's gross receipts by assuming that the taxpayer marked up his liquor by 25 percent for resale at the retail level and multiplying the taxpayer's cost of goods sold by 125 percent. Respondent calculated the taxpayer's taxable income by subtracting costs of goods sold and operating expenses from gross receipts so determined. We sustained respondent's calculations. On appeal, the taxpayer attacked our decision on the grounds that it was error to sustain respondent's percentage markup determinations without regard to the net worth computations offered by petitioners at trial. The Fifth Circuit, in rejecting the taxpayer's contention that net worth determinations should always be considered, stated that: For [the *444 taxpayer] the percentage markup method was the most reasonable means of computing income because his cost of sales in each taxable year was known with certainty. In comparison, net worth or bank deposit computations would lack any known figure because [the taxpayer] transacted a substantial amount of his liquor business in cash, and he readily commingled cash flowing to and from personal and business expenses. The supposed disparity between the percentage markup and net worth determinations is based almost exclusively on [the taxpayer's] own testimony concerning his property, expenses, and money hoards. Moreover, the Commissioner did disclose possible unreported income drains in the elimination of certain debts and the purchase in 1959 of two new air-conditioned Cadillacs. Webb v. Commissioner, supra at 373. Similarly, in the instant case, the specific-item determination of income is the most reasonable method because petitioners' gross receipts have been determined with certainty. Petitioners' only complaint is that they have not been given sufficient credit for costs of goods sold. In contrast, a net worth determination lacks any known figures because *445 petitioners transacted a substantial amount of their fish business in cash and readily commingled their business and personal expenses. In Webb v. Commissioner, supra, much of the courts' reluctance to consider the taxpayer's net worth computations stemmed from the fact that such computations were based almost exclusively on the taxpayer's own self-serving testimony. Here, Mr. Powers prepared his net worth computations from banking records and court documents, as well as petitioners' testimony. In addition, Mr. Powers made an unannounced visit to petitioners' home on June 14, 1985 and took an inventory of the contents of their safe. The inventory revealed nothing of substantial value. In our view Mr. Powers' computation of petitioners' net worth suffers from several fatal flaws and, therefore, we decline to accept it as an indication of petitioners' income during the years at issue. Despite his claimed thoroughness, Mr. Powers was completely unaware of the fact that petitioners had purchased an airplane during the years at issue. In addition, by consulting court documents, Mr. Powers concluded that petitioners owned 522 acres of land during each of the *446 years at issue. However, at trial, Mr. Tharp indicated that he may have owned over 600 acres of land during the years at issue. Mr. Powers, himself, testified that he still could not say for certain how many acres of land petitioners owned during the years at issue. Furthermore, because Mr. Powers obviously did not consult land records all over the United States, he could not have determined whether petitioners owned or purchased any land outside the Humphreys County area. Even if the amount of land or other assets remained constant during the years at issue, Mr. Powers' failure to take them into account highlights the shortcomings of his net worth computations. Mr. Powers also failed to consider the effect, if any, which petitioner's inventory of salable fish may have had on the net worth computations. While petitioner, who is a cash-basis taxpayer, may have expensed the costs of raising these fish and, therefore, had no basis in this inventory for tax purposes, the fact of the matter is that, as of the beginning of 1979, petitioner had, on hand, valuable merchandise. Even if petitioner's inventory decreased over the period at issue, the fact remains that it represents an asset *447 which never showed up in Mr. Powers' calculation of net worth. His failure to consider the effect of inventory on net worth further illustrates the inadequacies of his computations. Finally, we note that, despite his use of banking records and court records, Mr. Powers still relied on the uncorroborated statements of petitioners in preparing the most important aspects of his net worth computations. For example, the figure which Mr. Powers used for "cash on hand" is completely dependent on Mr. Tharp's self-serving statements. Although Mr. Powers' inventory of petitioners' safe may well have been unannounced, it clearly took place more than three years after the close of the last year here at issue and more than two years after petitioners' attorney was notified of the criminal investigation against Mr. Tharp. There is simply no way to ascertain what the safe contained during the years at issue. Mr. Powers did not investigate whether the safe may have contained cash or other valuables which had been removed to another place after petitioner was aware that his income tax liability was being investigated. In short, we find petitioners' computation of their net worth to be wholly *448 inadequate for use in determining their true income for 1979, 1980, and 1981. At trial Mr. Tharp's testimony was evasive and in many instances inherently unbelievable. The net worth computation, which depends primarily on the statements of Mr. Tharp (who was responsible for the lack of records of his business transactions which were largely conducted in cash), is no more than Mr. Tharp's self-serving statement that he did not have the income determined by respondent. We conclude that the net worth statement offered by petitioners does not show respondent's computations in the notice of deficiency to be arbitrary or excessive. Petitioners next contend that they have introduced other evidence sufficient to discredit respondent's determinations and, therefore, the burden of proof should be shifted to respondent. Petitioners argue that Mr. Tharp could not possibly have grown the large amount of fish he admittedly sold and, therefore, he must have purchased these fish from other catfish farmers. Specifically, petitioners contend that Special Agent Baker failed to follow up numerous "leads" which, if pursued, would have revealed further cash fish purchases by petitioner. Petitioners *449 contend that Mr. Tharp's cost of goods sold in each of the years at issue was dramatically higher than respondent has determined under his "specific-item" approach to the reconstruction of their income. In support of their contention that respondent's determinations are erroneous, petitioners first point to the sworn statement of Mr. Dwayne Glasner, the manager of petitioner's fish farm during the years at issue. Special Agent Baker interviewed Mr. Glasner in 1983 as part of his criminal investigation and the parties stipulated that his sworn statement should be accepted as if he testified at trial. During the course of the interview, Special Agent Baker asked Mr. Glasner if Mr. Tharp had purchased catfish from each of 38 individual fish farmers. Mr. Glasner answered yes to most of the inquiries. Special Agent Baker then asked Mr. Glasner to approximate the amount of fish Mr. Tharp purchased from each farmer over the years at issue. Petitioners contend that, since respondent's determinations show that petitioner purchased fish from only 16 separate farmers, Special Agent Baker must not have questioned all of the individuals identified by Mr. Glasner and, therefore, they obviously *450 have not been given credit for some cash purchases of fish. Petitioners further contend that Mr. Glasner's statement should be accorded special deference both because Mr. Glasner is a disinterested party and because the statement was taken closer to the time the events in question occurred. We agree with petitioners that Mr. Glasner's statement is reliable evidence. Because his statement was taken only two years after the close of the last year at issue herein, Mr. Glasner could undoubtedly testify accurately as to those things of which he had personal knowledge, such as the conduct of petitioner's fish farm operation. Moreover, since Mr. Glasner does not appear to have a personal stake in the outcome of this case, his testimony need not be discounted as self-serving. However, we do not agree with petitioners that Mr. Glasner's testimony proves that respondent's calculation of petitioner's costs of goods sold was arbitrary. Initially, we note that it is unclear to what extent the individuals identified by Mr. Glasner were engaged in separate operations. Many of the farmers were related and may have, in fact, operated the same fish farm operation jointly, rather than representing *451 two or more independent sources of fish (i.e., R.B. and Reubel Hoke). In any event, the bulk of Mr. Glasner's statement simply does not support petitioners' contentions in this case. As noted above, Mr. Glasner was asked to approximate the amount of fish purchased from each of the identified farmers over the taxable years 1979 through 1981. He gave approximations for only 29 of the 38 individuals he had previously identified. His answers were, at best, general estimates, varying in some cases by up to 100,000 pounds. His answers simply were not specific enough to discredit respondent's determination and certainly were not specific enough to form a basis for even a rough total for costs of goods sold. Furthermore, in some cases, his estimates were just plain wrong. For example, Mr. Glasner estimated that petitioner purchased 100,000 pounds of catfish from Mr. Billy Paul Thornton. Respondent called Mr. Thornton as a witness at trial. Mr. Thornton testified that his records show fish sales of only $ 2,080 to petitioner during the taxable years 1979 through 1981, which would mean that the maximum amount Mr. Tharp could have purchased from Mr. Thornton during the years 1979 through *452 1981 would be from 3,400 to 3,900 pounds of fish. We found Mr. Thornton's testimony to be completely credible. Mr. Glasner also stated that petitioner had purchased 40,000 to 50,000 pounds of fish from a neighboring fish farmer, Mr. Arthur B. Evans, during the taxable years 1979 through 1981. Again, respondent called Mr. Evans as a witness at trial. Mr. Evans stated unequivocally that petitioner had not purchased any fish from him during this period. We also found his testimony to be completely credible. Finally, petitioners' argument that Special Agent Baker's investigation was incomplete is contrary to the credible evidence of record. Special Agent Baker testified that he followed up on every lead produced by his interview with Mr. Glasner and, for that matter, every lead produced by his own investigation or provided by petitioners' attorney. Despite his exhaustive investigation, Special Agent Baker was unable to corroborate many of Mr. Glasner's recollections as to persons from whom petitioner purchased fish during the years 1979 through 1981. We found Special Agent Baker's testimony complete and credible. At trial, petitioners did not offer the corroborating testimony *453 of even one of the farmers who was identified by Mr. Glasner and from whom Mr. Tharp claims to have purchased fish. Petitioners claim that the testimony of these farmers was not "within their possession." Therefore, according to petitioners, the general rule, that when a party fails to introduce evidence within his possession which if true would be favorable to him, the inference must be that the evidence is unfavorable, is not applicable here. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); Davis v. Commissioner, 88 T.C. 122, 143 (1987), affd. 866 F.2d 852 (6th Cir. 1989). Petitioners contend that the testimony of these farmers could not be trusted because, if they admitted their cash sales to petitioner, their own Federal income tax returns might come under scrutiny. While it is true that the testimony of the fish farmers was not physically within the possession of petitioners in the same sense that documents such as purchase invoices might be (had petitioner bothered to maintain any records of his purchases), the means to subpoena these farmers certainly *454 was, as was the means to enforce the subpoena. Rule 147(a); Rule 147(e). We note that respondent was able to induce at least twelve catfish farmers to testify at trial. If petitioners had produced, at trial, the farmers from whom they claim to have purchased fish, the Court could have judged from their demeanor the credibility of their testimony. The failure to call these potentially significant witnesses leads inescapably to the inference that their testimony would have been unfavorable to petitioners. American Police & Fire Foundation v. Commissioner, 81 T.C. 699 (1983). The testimony of neither Mr. Ashworth nor Mr. Tharp corroborates the statements of Mr. Glasner. When asked to identify the farmers from whom Mr. Tharp purchased fish, Mr. Ashworth repeatedly and emphatically stated that he could not be certain of any of his answers since the purchases may have taken place after he went into business for himself. Both Mr. Ashworth and Mr. Tharp contradicted Mr. Glasner's statements as often as they corroborated them. According to Mr. Powers' computations, which were based on the total dollar amounts of fish that respondent determined Mr. Tharp purchased *455 during the years 1979 through 1981, Mr. Tharp purchased 1,055,449 pounds of fish. This amount is higher than Mr. Glasner's minimum estimate of 858,000 pounds of fish purchased by Mr. Tharp during these years but less than his high estimate of 1,181,000 pounds. We conclude that Special Agent Baker's investigation was both thorough and complete. Next, petitioners contend that respondent's determinations are incorrect and must be set aside because he has not explained how Mr. Tharp obtained the large amounts of fish he sold if, as respondent contends, he did not purchase these fish from other farmers. Petitioners introduced into evidence several computations prepared by Mr. Powers which attempt to show the sources of the fish which Mr. Tharp sold. According to Mr. Powers, respondent's determinations indicate that petitioner purchased only 13,162 pounds of fish in 1979, 91,409 pounds in 1980, and 950,878 pounds in 1981. Mr. Powers also assumed that petitioner obtained 15,000 pounds of fish in each of the years 1980 and 1981 in exchange for fingerlings. Finally, Mr. Powers determined that if, in accordance with the parties' stipulation, petitioner purchased 402.56 tons of fish feed *456 in 1979, 318.225 tons in 1980, and 199.98 tons in 1981, the maximum amount of fish petitioner could have produced during the years at issue, given the amount of feed purchased and a two pounds of feed to one pound of catfish conversion ratio, would have been 402,560 pounds of catfish in 1979, 318,225 pounds of catfish in 1980, and 199,980 pounds of catfish in 1981. Mr. Powers determined that, through purchases (as determined by respondent), exchanges, and farming, petitioner had 415,722 pounds of fish available for sale in 1979, 424,634 pounds in 1980, and 1,165,858 pounds in 1981. However, utilizing the stipulated amounts of gross receipts, Mr. Powers determined that petitioner sold 695,939 pounds of fish in 1979, 676,415 pounds of fish in 1980, and 1,302,768 pounds of fish in 1981. Mr. Powers therefore calculated that in 1979, petitioner sold 280,217 pounds of fish more than he had available for sale through purchases, exchanges and farming in 1979; in 1980, he sold 251,781 pounds more than he had available for sale; and in 1981, petitioner sold 136,910 pounds of fish more than he had available for sale in 1981. Petitioners maintain that the source of these excess catfish are *457 purchases by petitioner for which respondent has not allowed additional costs of goods sold. Petitioners also maintain that, faced with the above discrepancies in respondent's determinations (as highlighted by Mr. Powers' calculations), we must disregard respondent's determinations as arbitrary and excessive or, at the very least, allow additional costs of goods sold. Respondent, on the other hand, contends that petitioner grew the excess catfish on his farm and that petitioners have been allowed all costs of goods sold (whether in the form of purchases from other farmers or in the form of expenditures for feed and related expenses connected with the growing of fish) to which they are entitled. Respondent further argues that any mathematical imprecision in his determinations is due to petitioners' penchant for cash transactions and their failure to keep accurate books and records in accordance with the requirements of section 6001 and section 1.6001-1, Income Tax Regs.
We agree with respondent that, under the circumstances, his attempts to reconstruct petitioners' income for the years at issue are not arbitrary and, therefore, we will not shift the burden of going forward with *458 the evidence to respondent. In Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), the Fifth Circuit, in affirming our decision, stated that: We recognize that the absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes. * * * But such absence does weaken any critique of the Commissioner's methodology. * * * Arithmetic precision was originally and exclusively in [the taxpayer's] hands, and he had a statutory duty to provide it. He did not have to add or subtract; rather, he had simply to keep papers and data for others to mathematicize. Having defaulted in his duty, he cannot frustrate the Commissioner's reasonable attempts by compelling investigation and recomputation under every means of income determination. Nor should he be overly chagrined at the Tax Court's reluctance to credit every word of his negative wails. [Citations omitted.] Webb v. Commissioner, supra at 373. Similarly, in this case, arithmetic precision was originally in the hands of petitioner. He could have maintained records of his cash purchases but did not. He could have run these omitted purchases and *459 sales through petitioners' bank account so that they would show up in the accounting records prepared by the Puckett firm. He did not. Faced with this inadequacy in petitioners' records, respondent contacted virtually every individual with whom petitioner did business or might have done business during the years at issue and performed a specific-item determination of petitioners' income. Having defaulted in their statutory duty to maintain accurate records, petitioners will not be permitted to frustrate this reasonable attempt to reconstruct their income and shift the burden of going forward with the evidence to respondent. Furthermore, we do not agree with petitioners that the amount of feed Mr. Tharp purchased in each of the years at issue is determinative of the amount of fish he could have grown and sold during such years. The parties have stipulated to the amount of feed purchased during 1979, 1980, and 1981. However, there is no indication of how much feed petitioner had on hand at the beginning of 1979. Naturally, any estimate as to his production of fish during the ensuing years could vary dramatically depending on this figure. Thus, in order to make an accurate estimate *460 based on feed alone, we would have to know the amount of feed petitioner had on hand at the beginning of 1979 and the end of 1981. In addition, given the fact that it takes twelve to twenty-four months to grow a catfish of marketable size, in determining the pounds of fish petitioner grew in any one year, the more relevant inquiry would be how much feed petitioner used in the prior year or prior two years. If we assume that Mr. Tharp grew his catfish for at least twelve months before selling them, any fish which he sold during the period January 1, 1979 through December 31, 1979, would necessarily have been placed in ponds and fed during the period January 1, 1978 through December 31, 1978. We have no way of determining how many tons of feed petitioner purchased in 1977 or 1978, nor do we have any way of determining how many fully grown catfish were on hand at the beginning of 1979. On their 1978 return, petitioners' deducted feed purchases of $ 79,835.76. However, the return does not disclose how many tons of feed were purchased. The price of feed appears to have fluctuated drastically during the years at issue thus making impossible an accurate estimate of the tons of feed *461 purchased. For example, assuming that the amounts deducted for feed on petitioners' 1979, 1980, and 1981 returns correspond to the tons of feed which the parties have stipulated that petitioner purchased during such years, petitioner paid an average of 14 cents per pound of feed in 1979, 8 cents per pound of feed in 1980, and 12 cents per pound of feed in 1981. If we assume petitioner purchased $ 79,835.76 worth of feed in 1978 at the high average price of 14 cents per pound, we would have to conclude that he purchased only 285.13 tons of feed in 1978. On the other hand, if we assume petitioner purchased $ 79,835.76 worth of feed at an average of 8 cents per pound, we would have to conclude that he purchased 498.97 tons of feed in 1978. There is no basis in this record to accurately estimate the amount of feed purchased or, based on consumption of feed, the amount of fish grown in 1978, 1979, 1980 or 1981. In any event, we need not rely on guesswork. We need only examine Mr. Tharp's testimony at trial to determine the amount of fish he could have grown during each of the years at issue. Mr. Tharp was questioned extensively regarding the amount of fish per water-acre that he *462 produced during the years at issue and the amount of water-acres which were devoted to the production of food-fish. His testimony was often confusing and contradictory and most of it we do not accept or consider credible. However, Mr. Tharp testified unequivocally that, during 1979, 1980, and 1981, he produced between 2,500 and 3,500 pounds of food-fish per water-acre and we consider this acceptable as an admission warranting the conclusion that he grew at least this amount of fish. Also, to some extent this testimony by Mr. Tharp is supported by testimony of a county agent who petitioners called as a witness at trial. Mr. Tharp also testified that, during these years, he devoted increasing amounts of water-acres to the production of fingerlings, rather than food-fish. He testified that, at a minimum, out of the 250 water-acres in production during the years at issue, 220 water-acres were devoted to the production of food-fish during 1979, 190 water-acres were devoted to the production of food-fish during 1980, and 170 water-acres were devoted to the production of food-fish during 1981. If we assume that Mr. Tharp produced between 2,500 and 3,500 pounds of food-fish per water-acre, *463 it becomes apparent that he could have grown between 550,000 and 770,000 pounds of food-fish during 1979, between 475,000 and 665,000 pounds of food-fish in 1980, and between 425,000 and 595,000 pounds of food-fish in 1981. Therefore, it is clear from Mr. Tharp's own testimony that he could have grown the excess fish he claims to have purchased. Although Mr. Glasner's recollection of the individuals from whom petitioner purchased fish in the years in issue was not accurate, his testimony of the general operations of the farm was very reliable. Mr. Glasner was the manager of petitioner's fish farm. His testimony establishes a reasonably reliable picture of the relative amounts of fish petitioner grew and purchased during 1979, 1980, and 1981. In general, Mr. Glasner described a downward trend in petitioner's food-fish production due to the conversion of ponds to fingerling production and petitioner's failure to purchase feed sufficient to grow the amount of fish they sold. Mr. Tharp's testimony corroborates Mr. Glasner's assessment of the situation. We, therefore, conclude that, although respondent's determinations remain presumptively correct, Mr. Glasner's testimony shows that *464 petitioner's costs of goods sold in 1980 was probably in excess of that determined by respondent in his notice of deficiency. Mr. Glasner stated that, during 1979, petitioner grew 95 percent and purchased five percent of the fish he sold to Mr. King. According to the parties' stipulation of facts, petitioner sold 484,330 pounds of fish to Mr. King in 1979. Five percent of this amount is 24,216. This figure is reasonably close to the 13,162 pounds of fish purchases obtained by petitioners' expert using $ 7,480, the dollar amount of fish purchases determined by respondent, as a starting point. There is nothing in the record to indicate that petitioner purchased any fish in 1979 other than a small amount of the fish he sold to Mr. King. Therefore, we decline to disturb respondent's determination and allow petitioner any further costs of goods sold in 1979. Mr. Glasner further stated that, for 1981, petitioner grew 25 percent of the fish he sold to Mr. King. According to the parties' stipulation of facts, Mr. King purchased 1,196,568 pounds of fish from petitioner in 1981. When Mr. Glasner's estimate of the percentage of fish grown is applied to this stipulated figure, petitioner *465 appears to have grown 299,142 pounds of the food-fish he sold to Mr. King in 1981 and purchased the remaining 897,426 pounds. Petitioners also concede that they obtained another 15,000 pounds of fish through exchange for fingerlings. When this amount conceded is added to the 897,426 pounds purchased (determined by applying Mr. Glasner's percentage estimate), the total is 912,426 pounds. On the other hand, petitioners' expert, Mr. Powers, computed the pounds of fish purchased in 1981, as shown in the notice of deficiency, to be approximately 950,878 which after correction for certain mathematical errors which appeared in the stipulation should be 928,151 pounds of food-fish. As is apparent, the two figures, 912,426 and 928,151, are remarkably close and, under these circumstances, we decline to disturb respondent's determination of petitioner's 1981 costs of goods sold. Mr. Glasner stated that, during 1980, petitioner grew 60 percent of the fish he sold to Mr. King. According to the parties' stipulation of facts, petitioner sold 581,351 pounds of food-fish to Mr. King in 1980. Based on Mr. Glasner's estimate, petitioner grew 348,811 pounds of the food-fish he sold to Mr. King in *466 1980 and purchased 232,540 pounds of the food-fish he sold in that year. According to Mr. Powers' computations, which were based on stipulated dollar purchases and price per pound estimates, the stipulation of facts only credits petitioner with the purchase of approximately 91,409 pounds of food-fish in 1980. Petitioners do appear to concede, however, that Mr. Tharp obtained 15,000 pounds of food-fish in exchange for fingerlings. Nevertheless, if we accept Mr. Glasner's estimate of fish petitioner grew and sold to Mr. King, petitioner purchased at least 126,131 more pounds of fish in 1980 than determined by respondent. Under Mr. Powers' calculations, petitioner purchased food-fish for resale from local fish farmers for approximately 65 cents per pound during 1980. Although the evidence leaves many unanswered questions, from the record as a whole and particularly Mr. Glasner's testimony, we conclude that petitioners are entitled to an amount of costs of fish sold in 1980, in addition to the amount determined by respondent, of $ 81,985. We recognize that petitioners claim that fish were bought for sale to purchasers other than Mr. King in amounts in excess of the purchases allowed *467 by respondent. There is no evidence in the record to support this contention. Furthermore, there is not even any evidence in the record on which to base an estimate of the amount of these fish (in excess of that determined by respondent), if any, petitioner may have purchased. An estimate of any such amount of purchases would be totally without factual foundation. See Ronnen v. Commissioner, 90 T.C. 74, 102-103 (1988); Stemkowski v. Commissioner, 82 T.C. 854, 861 (1984). Petitioners finally contend that they simply could not possibly have earned the large amounts of income with which they have been charged. Petitioners elicited testimony from several witnesses that their life style remained frugal during the years at issue. The net worth computation prepared by Mr. Powers shows an increase in their debt to PCA in 1980 and 1981. Petitioners claim that they were forced to incur this debt just to keep the fish farming business afloat. Furthermore, according to petitioners, in 1985, they had to sell large amounts of land to pay down this debt. Petitioners also point to the fact that Mrs. Tharp obtained employment outside the home in 1984 and *468 obtained a loan for the purchase of a car in 1987. Petitioners state that respondent has introduced no evidence of extravagance or large cash expenditures during the years at issue. The short answer to petitioners' arguments is that respondent is not required to show just where and how petitioners spent the unreported income they earned. It is enough that he has determined that there was unreported income and that this determination is clearly supported by the evidence. It may be true that petitioners' debt increased in 1980 and 1981. However, their debt substantially decreased in 1979. Mrs. Tharp testified that she obtained employment and financed the purchase of her car because petitioners were short of funds. This testimony must be considered in conjunction with the fact that petitioners were fending off respondent's investigation by 1984 and Mr. Tharp was imprisoned in 1985. At this time, petitioners undoubtedly would have considered any large cash expenditures to be unwise because of the suspicion they would create. We find petitioners' claims unpersuasive. Petitioners next contend that a portion of the unreported gross receipts for 1981 are actually attributable to *469 an equal partnership between Mr. Tharp and Mr. Ashworth, which purportedly was formed on June 17, 1981. Respondent contends that no partnership ever existed and that Mr. Ashworth was merely an employee of Mr. Tharp's. Therefore, according to respondent, all of the unreported gross receipts from the sale of catfish during 1981 are attributable to petitioner. Section 761(a) provides that, "the term 'partnership' includes a syndicate, group, pool, joint venture or other unincorporated organization through or by the means of which any business, financial operation, or venture is carried on * * *." The test to be applied in determining whether a valid partnership exists for Federal income tax purposes is "whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." Commissioner v. Tower, 327 U.S. 280, 287 (1946); Bussing v. Commissioner, 88 T.C. 449, 460 (1987). The parties' intention in this respect is a question of fact to be determined from: (1) their agreement considered as a whole; (2) the parties' conduct in the execution of their agreement; (3) the statements *470 or testimony of the parties; (4) the testimony of disinterested persons; (5) the relationship of the parties; (6) their respective abilities and capital contributions; (7) the actual control of income and the purposes for which it is used; and (8) any other facts throwing light on their true intent. Commissioner v. Culbertson, 337 U.S. 733, 742 (1949); Commissioner v. Tower, supra at 287. We conclude that petitioners have not proven that a valid partnership was formed between Mr. Tharp and Mr. Ashworth for Federal income tax purposes. It seems obvious to us that the purported partnership was no more than a continuation by Mr. Tharp of the fish hauling business he conducted prior to June 17, 1981. Petitioner continued to sell fish after June 17, 1981 in the same manner as he had sold fish to Mr. King before that date. Mr. Tharp appears to have maintained sole control over the conduct of the business and over the finances of the business during the entire year 1981. Mr. Tharp made all of the important management decisions without consulting Mr. Ashworth. Mr. Tharp negotiated the price which the purported partnership would pay for the food-fish *471 it purchased. Indeed, Mr. Ashworth was usually not even present when Mr. Tharp paid for the fish and certainly did not know how much the food-fish cost. Mr. Tharp also dictated when the fish would be purchased and when Mr. Ashworth would transport the fish to King's Fish Market. After Mr. Ashworth returned from King's Fish Market, Mr. Tharp or Mrs. Tharp would take physical possession of the money which he had received on the sale of the fish. In short, Mr. Tharp controlled the physical conduct of the business and directed Mr. Ashworth's activities on a daily basis. Mr. Tharp also handled the financial aspects of the business. Mr. Tharp picked out and arranged for the acquisition of the tractor-trailer, as well as the water tanks, which were used in the business. Mr. Ashworth had no input on this decision; nor did he have any input into how the vehicle was to be financed. Mr. Tharp arranged the financing because the bank would not extend credit to Mr. Ashworth alone. Although Mr. Ashworth's name appeared on the title to the vehicle and on the bank note, he never made any payments on the note. Mr. Tharp made all payments on the note and made most, if not all, premium payments *472 on the vehicle's insurance policy. Mr. Tharp also arranged and personally financed the purchase of the second trailer. Although Mr. Ashworth and Mr. Tharp both testified that they intended to form a partnership, their actions demonstrate a different intent. Although they testified that they orally agreed to share profits equally, it is clear that Mr. Ashworth did not receive half of the net income generated by the fish hauling business. The stipulation reveals that approximately $ 280,860 in food-fish were sold to Mr. King and Mr. Boutwell during the period from June 17, 1981 through December 31, 1981. Mr. King bought these fish for 79 cents per pound. According to Mr. Powers' calculations, petitioner purchased these fish for approximately 60 cents per pound. Even if we assume, contrary to our finding above, that all of these fish were purchased from other farmers, the purported partnership still made a gross profit of approximately 25 percent on each pound of fish sold. Under such an assumption, a gross profit of approximately $ 70,215 was made on sales of $ 280,860. For purposes of illustration only, even if we assume contrary to the credible evidence, that the purported *473 partnership had total expenses of $ 50,000, there would still be $ 20,215 in net profit to be divided between Mr. Tharp and Mr. Ashworth. Yet, Mr. Ashworth received only $ 4,000 from Mr. Tharp during 1981. Therefore, it does not appear that Mr. Tharp felt bound to or in fact did pay over to Mr. Ashworth half of the profits of the fish-hauling business. To the extent Mr. Glasner had personal knowledge of the fish hauling business, his statements indicate that Mr. Tharp did not, in fact, split profits equally with Mr. Ashworth, in accordance with the purported partnership agreement. We conclude that, under the facts here present Mr. Tharp and Mr. Ashworth had no real intent to form a partnership. Rather, the fish hauling business was merely a continuation of the sole proprietorship conducted by Mr. Tharp prior to June 17, 1981. Absent proof of real intent to form a partnership, the arrangement cannot be considered a partnership for Federal income tax purposes. Place v. Commissioner, 17 T.C. 199, 206 (1951), affd. 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953); James v. Commissioner, 16 T.C. 930, 939-940 (1951), *474 affd. 197 F.2d 813 (5th Cir. 1952). We note, incidentally, that the failure of the alleged partnership to file a partnership return for the taxable year 1981 or issue Forms K-1 supports our conclusion that no real intent to form a partnership ever existed. Because we conclude that no partnership was formed for Federal income tax purposes, all of the stipulated gross receipts which went unreported in 1981 are attributable to petitioner. Petitioners are entitled to deduct all the costs of fish sold and to deduct as a business expense the $ 4,000 Mr. Tharp paid Mr. Ashworth as compensation in 1981. Section 162(a). The next issue for decision is whether petitioners are entitled, under section 175, to deduct the amounts which Mr. Tharp paid to Mr. Williams for the construction of catfish ponds in 1981. Section 263(a)(1) provides that, as a general rule, no deduction is allowed for amounts paid out for permanent improvements or betterments made to increase the value of any property or estate. However, section 263(a)(1)(C) excepts from this general rule soil and water conservation expenditures which are made deductible under section 175. Section 175(a) provides that *475 a taxpayer engaged in the business of farming may currently deduct "expenditures which are paid or incurred by him during the taxable year for the purpose of soil or water conservation in respect of land used in farming, or for the prevention of erosion of land used in farming * * *." Section 175(c)(1) states that the expenditures referred to are generally "expenditures paid or incurred for the treatment or moving of earth, including (but not limited to) leveling, grading and terracing, contour furrowing, the construction, control, and protection of diversion channels, drainage ditches, earthen dams, watercourses, outlets, and ponds, the eradication of brush, and the planting of windbreaks. * * *" (Emphasis supplied.) Section 175(c)(1)(A) specifically provides that such expenditures do not include "the purchase, construction, installation, or improvement of structures, appliances, or facilities which are of a character which is subject to the allowance for depreciation provided in section 167 * * *." Nor do they include any amount paid or incurred which would be allowed as a deduction regardless of section 175. Section 175(c)(1)(B). It is clear from the legislative history *476 of section 175 that the section was not intended to apply to development costs or the costs of making a field cultivable. AMFAC, Inc. v. Commissioner, 70 T.C. 305, 310-311 (1978), affd. 626 F.2d 109 (9th Cir. 1980). In order to be entitled to a deduction under section 175, petitioners must prove the facts on which they base their claim to such deduction and must show that their expenditures fall within the terms of the statute. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). Respondent argues that petitioners should not be allowed a deduction because they have failed to show that the purpose in constructing the catfish ponds was soil or water conservation or the prevention of erosion. According to respondent, petitioner's primary purpose in constructing the ponds was to develop lands which had previously been used for row crops and make them suitable for the cultivation of catfish. Respondent also argues that petitioners have failed to show that the catfish ponds are not of a character subject to depreciation and, therefore, they may not deduct construction costs because of the provisions of section 175(c)(1)(A). On the *477 other hand, petitioners claim that the unequivocal language of section 175 allows them to deduct the costs of constructing the ponds. They point out that the construction of ponds is clearly enumerated as an example of deductible expenditures in section 175(c). They also point to section 1.175-2(a)(1), Income Tax Regs., which provides that: (a) Expenditures treated as a deduction. (1) The method described in section 175 applies to expenditures paid or incurred for the purpose of soil or water conservation in respect of land used in farming, or for the prevention of erosion of land used in farming, but only if such expenditures are made in furtherance of the business of farming. More specifically, a farmer may deduct expenditures made for these purposes which are for (i) the treatment or moving of earth, (ii) the construction, control, and protection of diversion channels, drainage ditches, irrigation ditches, earthen dams, watercourses, outlets, and ponds, (iii) the eradication of brush, and (iv) the planting of windbreaks. * * * [Emphasis supplied.] Petitioners contend that, because their expenditures are clearly enumerated by section 175 and the regulations thereunder, *478 they need not engage in lengthy debate as to what their purpose in constructing the ponds was or whether or not the ponds are depreciable. We do not agree with petitioners that they have an unequivocal right to deduct the cost of constructing their catfish ponds under section 175. In order for expenditures to be deductible under section 175, the expenditures must be "for the purpose of soil or water conservation in respect to land used in farming or for the prevention of erosion of land used in farming * * *." Section 175(a). Such a purpose is clearly required in section 175(a) and in our view this overriding requirement is not removed simply because section 175(c)(1) happens to list pond construction as a possible means of achieving this goal. Nor do we consider the regulations to justify a different result. Section 1.175-2(a)(2), Income Tax Regs., provides that: (2) The following are examples of soil and water conservation: (i) constructing terraces, or the like, to detain or control the flow of water, to check soil erosion on sloping land, to intercept run-off, and to divert excess water to protected outlets; (ii) constructing water detention or sediment retention dams *479 to prevent or fill gullies, to retard or reduce run-off of water, or to collect stock water; and (iii) constructing earthen floodways, levies, or dikes, to prevent flood damage to farmland. It is significant that, in each example, the measure is undertaken to achieve the specific goal of soil and water conservation or prevention of erosion. In our view the regulations are a reasonable interpretation of the statute and are supported by its plain language. The legislative history of section 175 indicates that its enactment was intended to provide incentive for implementation of conservation measures. AMFAC, Inc. v. Commissioner, supra at 311. Therefore, in order to deduct the costs of pond construction, we hold that petitioners must demonstrate that soil and water conservation or the prevention of erosion was a specific goal for the construction. We conclude that, in this case, petitioners have failed to show that the ponds were constructed "for the purpose of soil or water conservation in respect to land used in farming, or for the prevention of erosion of land used in farming." At trial, Mr. Tharp testified that the ponds were constructed on land which belonged *480 to his father. Prior to the years here at issue, his father had "land-formed" the 113 acres, a process which involved the leveling out of the land so that it could be watered without erosion. Thus, at the time of construction, the land was not flooded nor was it subject to significant erosion problems. Furthermore, it does not appear that the construction of catfish ponds is particularly suited to prevention of erosion of land, although that may be one of its incidental benefits in certain locations and under certain conditions. Indeed, the construction of the ponds undoubtedly destroyed the results of the erosion-prevention measures which Mr. Tharp's father had undertaken years earlier. Nor do we see how submerging the land beneath water could possibly be considered a soil conservation measure and, while petitioner's ponds may have utilized a great deal of water, the mere utilization of water does not rise to the level of water conservation. See Hunter v. Commissioner, 46 T.C. 477, 487-489 (1966). In sum, we conclude that the conservation of soil or water or the prevention of land erosion played no part in petitioner's decision to construct the catfish ponds. *481 The only significant purpose served by the construction of such ponds was to increase the productivity of petitioner's catfish farm. Thus, petitioners are not entitled to deduct the full costs of construction under section 175. In his notice of deficiency, respondent determined that the petitioner's catfish ponds had a limited useful life and allowed petitioners a deduction for depreciation of these ponds under section 167 and section 168. Respondent's determination that the ponds are of a character subject to depreciation is supported by the evidence and petitioners have not offered any evidence to the contrary. Therefore, we uphold respondent's determination that petitioners are entitled to deductions for depreciation of the ponds. We also note that this holding precludes any deduction under section 175, regardless of petitioner's purpose in constructing the ponds. Hunter v. Commissioner, supra.
The next issue is whether Mr. Tharp is liable for additions to tax for fraud under section 6653(b) with respect to his underpayment of taxes for the years 1977 through 1981. Respondent conceded at trial that Mrs. Tharp is not liable for additions to tax for fraud *482 in any of the years in issue. The existence of fraud under section 6653(b) is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Meier v. Commissioner, 91 T.C. 273, 297 (1988); Kotmair v. Commissioner, 86 T.C. 1253, 1259 (1986). Respondent must prove by clear and convincing evidence that, in each of the years for which the section 6653(b) addition is determined an underpayment of tax exists and that some part of that underpayment of tax is due to fraud. Section 7454(a); Patton v. Commissioner, 799 F.2d 166 (5th Cir. 1986), affg. a Memorandum Opinion of this Court; Castillo v. Commissioner, 84 T.C. 405, 408-409 (1985); Rule 142(b). In the instant case we hold that respondent has proven by clear and convincing evidence that an underpayment of taxes exists for each of the years at issue and that a part of each such underpayment is due to fraud. The parties have stipulated that large amounts of gross receipts were omitted from petitioner's income as reported on his return in each of the years 1979, 1980, and 1981. Respondent caused an *483 exhaustive investigation to be made in an effort to locate the sources from which petitioner purchased the fish he sold and presented the results of this investigation at trial. The results of this investigation show that a large portion of the fish petitioner sold was actually grown on his own farm. The difference between costs of goods sold, as determined by respondent, and gross receipts, as stipulated to by the parties, is itself evidence of an underreporting of income and consequent underpayment of taxes. Even if petitioner had purchased all the fish he sold, the evidence overwhelmingly indicates that he made a profit on these transactions. The stipulation indicates that petitioner made a gross profit of anywhere from five to nineteen cents per pound on the fish he purchased for resale. Mr. Glasner stated that petitioner made between five and ten cents profit per pound of fish sold and Mr. Tharp's testimony, in part, corroborates this statement. Thus, it is clear that petitioner earned income on these sales and failed to report this income on his tax returns. We do not find Mr. Tharp's statement that he made no profit whatsoever and merely sold fish to Mr. King to keep *484 a valuable customer to be credible, especially in view of the fact that such sales continued over a three year period and, in fact, increased substantially in the third year. Nor do we find any basis in the record to support petitioner's claim that a market glut caused a downturn in his catfish business and forced the price of catfish down. The stipulated facts indicate just the opposite and expert testimony at trial reveals that such downturn did not take place until after the years at issue. Even if we accept Mr. Powers' computations of the amount of additional costs of goods sold to which petitioner is entitled, which we do not, his calculations still indicate that petitioner failed to report gross income of $ 33,388.48 in 1979, $ 165,868.53 in 1980, and $ 223,884.34 in 1981 and that after allowance of all farm expenses, these omissions result in omitted net income in each year here in issue. Finally, we note that petitioner has agreed to numerous adjustments to his income which result in an increase in taxable income and has stipulated to the fact that he failed to report, on his 1981 tax return, a rather large amount of income he received from hauling farm products. In short, *485 respondent has proven by clear and convincing evidence that an underpayment exists for each of petitioner's 1979, 1980, and 1981 taxable years. An underpayment exists for petitioner's 1977 and 1978 taxable years because petitioner obtained a refund by carrying back a claimed net operating loss to which he was not entitled. Respondent has also proven, by clear and convincing evidence, that a part of the underpayment for each year was due to petitioner's fraud with intent to evade tax. Respondent's burden of proving the existence of fraud is generally met if it is shown that the taxpayer intended to evade taxes known or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Patton v. Commissioner, supra at 171; Kotmair v. Commissioner, supra at 1259; Castillo v. Commissioner, supra at 408; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud is never presumed. Zell v. Commissioner, 763 F.2d 1139, 1143 (10th Cir. 1985), affg. a Memorandum Opinion of this Court. However, fraud need not be established by direct evidence. It *486 can be shown by surveying the taxpayer's entire course of conduct and drawing reasonable inferences from that conduct. Patton v. Commissioner, supra at 171; Recklitis v. Commissioner, supra at 910; Meier v. Commissioner, supra at 297. The Fifth Circuit Court of Appeals, to which the instant case is appealable, has held that a consistent understatement of income with the consequent underpayment of taxes is strong evidence of an intent to evade taxes. Patton v. Commissioner, supra at 171; Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. Similarly, a taxpayer's failure to maintain accurate and complete records, when coupled with other indicia, also supports a finding of fraud, as does a taxpayer's failure to supply his bookkeeper or accountant with all data necessary to maintain complete and accurate records. Reaves v. Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C. 690 (1958); Merritt v. Commissioner, supra at 487. In Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), *487 affg. a Memorandum Opinion of this Court, the Ninth Circuit Court of Appeals found that the following types of behavior are indicative of fraud: (1) implausible or inconsistent explanations of behavior; (2) concealment of assets; (3) failure to file tax returns; (4) failure to cooperate with tax authorities; (5) engaging in illegal activities; (6) attempting to conceal such activities; (7) dealing in cash; and (8) failing to make estimated tax payments. Meier v. Commissioner, supra at 297-298. In the instant case, respondent has shown that petitioner substantially understated his income in each of the years 1979, 1980, and 1981. This amounts to a consistent pattern of underreporting income and underpaying taxes. We simply do not believe petitioner's implausible claim that he naively and incorrectly believed that cash receipts were not income. Petitioner graduated from high school and had the basic business knowledge to conduct a business which, over a three-year period, earned gross receipts in excess of $ 2,000,0000. We conclude that petitioner understood his obligation to report all income and conducted his transactions largely in cash in order to conceal *488 his income with the hope that the Internal Revenue Service would be unable to trace his cash transactions. His failure to keep any records (i.e., invoices, receipts, ledgers, etc.) whatsoever of his cash transactions buttresses this conclusion. We do not believe petitioner's uncorroborated claim that he informed the Puckett accounting firm of his cash receipts and that Mr. Puckett told him it would be all right to exclude such receipts from his income. Petitioner's claim cannot be verified since Mr. Puckett is now dead. In any event, we do not believe that any reputable accountant would advise his client to exclude such large amounts of cash gross receipts and costs of goods sold from his income tax returns. We conclude that Mr. Tharp purposely hid this source of income from his accountants and from the Internal Revenue Service in order to evade income tax. He failed to deposit large amounts of catfish receipts in petitioners' bank account and in a further effort to conceal these receipts paid for the fish he purchased with cash rather than checks so that the disparity in fish sold and fish purchased would not be apparent. There are other factors which also indicate the presence *489 of fraud. As is apparent from our discussion thus far, Mr. Tharp has offered implausible explanations for his behavior. At trial, his testimony was evasive and inconsistent. It was simply impossible to obtain a straightforward answer in response to questions regarding the amount of land petitioner owned. We interpret this evasiveness as an attempt to conceal the true amount of land which petitioner did own during the years at issue. Petitioner also intended to evade Mississippi sales tax when paying for repairs on the tractor-trailer. Finally, petitioner's conviction under section 7206(1) shows that, at least as to his 1981 tax year, he knew that his income tax return was not true and correct and that he willfully filed such an untrue return. We conclude that this record contains clear and convincing evidence that some part of petitioner's underpayment of taxes in each of the taxable years 1979, 1980, and 1981 was due to fraud with intent to evade tax. Therefore, we sustain the imposition of the addition to tax under section 6653(b) for each of these years. We also conclude that petitioner fraudulently claimed a refund of taxes for his 1977 and 1978 tax years and, therefore *490 sustain the section 6653(b) addition to tax for such years. See Toussaint v. Commissioner, 743 F.2d 309 (5th Cir. 1984), affg. a Memorandum Opinion of this Court. The next issue for decision is whether the assessment and collection of taxes and additions to tax for 1977, 1978, 1979, 1980, and 1981 is barred by the statute of limitations. Section 6501(a) provides that, as a general rule, income tax must be assessed within 3 years after the taxpayer files his return for the year. Section 6501(e)(1)(A) provides that if a taxpayer omits from gross income an amount in excess of 25 percent of the gross income shown on his return, the tax may be assessed at any time within 6 years after the taxpayer files his return. The six-year period is clearly applicable under the facts we have found here and had not expired for any one of the years 1979, 1980 and 1981 when the notice of deficiency was issued. We will not discuss in detail the facts that show the applicability of the six-year statute since, if the taxpayer files a false or fraudulent return, the tax may be assessed and collected at any time. Section 6501(c)(1). Section 6501(h) provides that, in the case of a *491 deficiency attributable to a taxpayer's carryback of a net operating loss, the deficiency may be assessed at any time during which a deficiency for the taxable year that generated the net operating loss may be assessed. We have previously determined that petitioner filed false and fraudulent returns for each of the taxable years 1979, 1980, and 1981 and that a part of the underpayment in such years was due to fraud. Therefore, under section 6501(c)(1), respondent may assess deficiencies for such years at any time. Under section 6501(h), the assessment of deficiencies for petitioners' 1977 and 1978 taxable years is not barred since the deficiencies in such years are attributable to the carryback of a net operating loss which arose in 1980 and 1981. The final issue for decision is whether Mrs. Tharp qualifies as an "innocent spouse" under section 6013(e). As a general rule, when a husband and wife file a joint return for any taxable year, they are jointly and severally liable for any tax or deficiency owed for such year. Section 6013(d)(3). However, section 6013(e) provides that, where a person files a joint return with her spouse for a taxable year and such return contains *492 a substantial understatement of tax attributable to a grossly erroneous item of her spouse, she may, under certain circumstances, be relieved of liability for deficiencies, additions to tax, and interest for such taxable year. Section 6013(e)(1)(A); section 6013(e)(1)(B). It is clear that Mrs. Tharp filed a joint return with Mr. Tharp for each of the years at issue and these returns showed a substantial understatement of petitioners' tax. The substantial understatements were attributable to grossly erroneous items of Mr. Tharp (e.g., his fraudulent omission of large amounts of income). However, in order to be relieved of liability in accordance with section 6013(e), Mrs. Tharp must establish that in signing the return she did not know, and had no reason to know, that there was a substantial understatement of tax. Section 6013(e)(1)(C). Mrs. Tharp must also establish that, taking into account all the facts and circumstances, it would be inequitable to hold her liable for the deficiency attributable to such substantial understatement. Section 6013(e)(1)(D). Mrs. Tharp claimed at trial that she did not know of Mr. Tharp's omissions of income and, therefore, she did not know *493 of the substantial understatements of tax. She testified that she signed the return without reviewing it. The record here shows that Mrs. Tharp at times received the cash from fish sales. It shows that she wrote most of the checks on petitioners' joint bank account and would ask Mr. Tharp to deposit sums to cover these checks, a clear indication that she knew that all cash was not being deposited in that account. The record also shows that Mrs. Tharp knew that petitioner's accounting records of the fish business were made up from the bank records and that the tax returns were prepared from these accounting records. With this knowledge, it is clear that Mrs. Tharp did know of the substantial underreporting of income on the return, even if she deliberately chose not to look at the return. She also must have been aware that failure to report income could result in an understatement of tax. We need not rely entirely on our conclusion that Mrs. Tharp knew of the understatement of tax since, in order to come within the provisions of section 6013(e), she must also show that she had no "reason to know" of the substantial understatements of tax during the years at issue. This she *494 has failed to do. In determining whether a spouse has "reason to know" of a substantial understatement of tax attributable to her husband's omissions from gross income, the Fifth Circuit Court of Appeals has adopted a common law "reason to know" standard which contains both subjective and objective criteria. [2]Sanders v. United States, 509 F.2d 162 (5th Cir. 1975). Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. a Memorandum Opinion of this Court. The relevant inquiry is whether, taking into account the spouse's circumstances at the time she signed the return (i.e., intelligence, emotional state, level of involvement in the financial transactions giving rise to the income, complexity of such transactions, lavish or unusual expenditures, etc.), a reasonably prudent person would be expected to know that the tax liability stated was erroneous or that further investigation was warranted. Stevens v. Commissioner, supra at 1505; Sanders v. United States, supra at 166-168. Thus, the inquiry is essentially a factual one. Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986), *495 affg. on this issue a Memorandum Opinion of this Court. In the instant case, petitioners claim that Mrs. Tharp did not participate in the operation of the catfish farm and had no knowledge of Mr. Tharp's business operations. Instead, according to petitioners, Mrs. *496 Tharp ran the family home and relied entirely on Mr. Tharp to handle all business matters. Petitioners claim that Mrs. Tharp was not placed on notice of the omitted income through unusual or lavish expenditures. Finally, petitioners claim that Mrs. Tharp did not review the returns before signing them and would not have understood the returns even if she had reviewed them. Petitioners conclude that Mrs. Tharp had no reason to know of the substantial understatements of tax and is entitled to innocent spouse treatment. Petitioners also contend that respondent's decision not to pursue the section 6653(b) additions to tax for fraud against Mrs. Tharp amounts to a concession that she is entitled to innocent spouse treatment. We reject, out of hand, petitioners' contention that respondent's concession with regards to the section 6653(b) fraud addition somehow entitles Mrs. Tharp to innocent spouse treatment under section 6013(e). The two provisions are totally unrelated and their applicability to a specific set of facts depends on entirely different elements. Entitlement to innocent spouse treatment under section 6013(e) requires not only an absence of fraudulent intent but also an *497 absence of knowledge of the circumstances giving rise to the omitted income. McCoy v. Commissioner, 57 T.C. 732, 734 (1972). In addition, the burden of proof with respect to the fraud addition is on respondent and respondent must meet his burden by clear and convincing evidence. In contrast, petitioners must come forward with evidence sufficient to show Mrs. Tharp's entitlement to innocent spouse treatment. Sonnenborn v. Commissioner, 57 T.C. 373, 381-383 (1971). We also reject petitioners' contention that Mrs. Tharp had no reason to know of the substantial understatements. While the presence of unusual or lavish expenditures can weigh heavily against a spouse's claim of ignorance, the absence of such expenditures certainly does not require a finding that the spouse had no "reason to know." We further note that the alleged innocent spouse's role as homemaker and her claimed complete deference to her husband's judgment concerning the couple's finances, standing alone, are insufficient to establish that the spouse had no "reason to know." Stevens v. Commissioner, supra at 1505-1506; Shea v. Commissioner, supra at 566. *498 In any event, despite petitioners' claim to the contrary, it is apparent that Mrs. Tharp did participate to some extent in the operation of the farm. She had unfettered access to the couple's joint bank account and regularly paid farm expenses out of such account after reviewing the bills with Mr. Tharp. Furthermore, Mrs. Tharp was well aware of the large amounts of cash flowing in and out of petitioners' home as Mr. Tharp bought and sold fish. In fact Mr. Ashworth at times turned the cash received from the sale of fish over to her. She had reason to know that all cash was not deposited since she requested her husband to make deposits to cover checks. She knew that petitioners' books were compiled from the bank statements and that the Federal tax returns were based on the books. Mrs. Tharp graduated from high school and appears to be a person of reasonable intelligence. She does not appear to have been suffering from any physical or emotional problems which could have hampered her ability to understand the relatively simple transactions taking place around her. Nor could she turn a blind eye towards these activities or completely abdicate her responsibility to ensure that the *499 return she was signing was true and correct to the best of her knowledge. Stevens v. Commissioner, supra at 1507; Sanders v. United States, supra at 169. In our view, a reasonably prudent person in Mrs. Tharp's position knowing of the cash received from fish sales would have questioned the propriety of the losses reported and the refunds claimed even if, as petitioners contend, she did not review the returns in any detail before signing them. In sum, we conclude that petitioners have failed to establish that Mrs. Tharp did not know and had no reason to know of the substantial understatements of tax and we need not reach the question of whether it would be inequitable to hold Mrs. Tharp liable for the deficiencies. We hold that Mrs. Tharp is not entitled to innocent spouse treatment under section 6013(e). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. 1 Restatement, Agency 2d, sec. 9, comment d (1958) provides that: A person has reason to know of a fact if he has information from which a person of ordinary intelligence, or of the superior intelligence which such person may have, would infer that the fact in question exists or that there is such a substantial chance of its existence that, if exercising reasonable care with reference to the matter in question, his action would be predicated upon the assumption of its possible existence. The inference drawn need not be that the fact exists; it is sufficient that the likelihood of its existence is so great that a person of ordinary intelligence, or of the superior intelligence which the person in question has, would, if exercising ordinary prudence under the circumstances, govern his conduct as if the fact existed, until he could ascertain its existence or nonexistence. * * * ↩